Good morning. May it please the court, Melinda Cantrell, on behalf of the defendants, appellants, Deputy Conley and Deputy Peterson. I plan to reserve five minutes for rebuttal. This case involves very unusual circumstances wherein the plaintiffs were living in a shed in the backyard of a residence and were shot by deputies who were searching for a felony suspect at large who was considered armed and dangerous. The defendants should have been entitled... They were considered armed and dangerous because they were all considered armed and dangerous. Well, Your Honor, the district court made a finding that the department classified him as armed and dangerous and that the deputies were searching the backyard with their guns drawn as they believed him to be armed and dangerous. And so I would respectfully submit from the viewpoint of these defendant officers who were assisting on the day of the incident, they had reason to believe that the suspect was considered armed and dangerous. Now, I would submit that the defendants should have been entitled to qualified immunity from the plaintiff's Fourth Amendment warrantless search and not going to announce claims based on four separate grounds, each of which is sufficient to overturn the verdict. And I would like to spend some time addressing each of those grounds today. First, the defendants are entitled to qualified immunity as a reasonable officer in their position could have failed to recognize that the shed was actually the plaintiff's home that they were currently living in based on the appearance of the shed and the appearance of the backyard. But they were told otherwise. Correct, Your Honor. The district court made a finding that during the debriefing, Deputy Riesling advised that a male and a female lived in the backyard. However, the defendant officers both testified that when they arrived in the backyard, they did not view that shed as a habitable residence. The district court made a finding that the defendants mistakenly believed that that shed was a storage shed just similar to the other three sheds in the area and that the only person that could be hiding there was the felony suspect at large. Now if that mistake of fact was reasonable, qualified immunity should apply. And I would submit that as depicted in the photographs at ER 199 and 204 through 207 and 204 and 205 in particular, based upon the condition of the debris strewn yard with abandoned automobiles, the other sheds, the garbage around the area, and the condition of the actual seven foot by seven foot windowless shed that was made of plywood and wood in which the plaintiffs were residing, one reasonable officer could have either failed to realize that that was the shed in which the plaintiffs were living or a reasonable officer could have believed that, if that had at some point been where the plaintiffs were staying, that it was abandoned. And I cite it to McKinney v. Harrison, which is a somewhat similar case because when the officers arrived at the home, because of the unkempt condition of the home, the officers could mistakenly believe that no one was living there anymore. What exact difference does it make if I bet it was living there? I'm sorry? What exact difference does it make if nobody was living there? Do they have any right to go in anyway? If the property is considered abandoned, there's no Fourth Amendment protection, a reasonable officer... Abandoned? It was in somebody's curtilage, wasn't it? Well, if the officers are supposed to have understood that that was a separate dwelling... No, but you just said they shouldn't have understood that. So then if they thought it was a shed related to the main house, did they give them any right to go in it? If they thought it was a shed in which no one was living in, I think they had a right to clear the shed as part of... Why? Because they were tasked with clearing the backyard for officer safety as the other officers went to the main residence.  It doesn't solve the question. The officers were... If they did not believe that anyone was living there or that no one was living there still, there would be... A reasonable officer could have believed that it was proper and not unlawful to enter the shed without a warrant and without knocking and announcing their presence. As what? As an exigent circumstance? Well, that is the next basis for qualified immunity. Because I don't know what it changes exactly, whether they knew somebody was living there or not. The first reason I think they are entitled to qualified immunity is because it doesn't look like an actual home, which... I understand that. I want to know why that makes a difference. Because if it's not a home, the officers aren't required to get a search warrant to clear the area. They're not? I mean, it's still somebody's property. Oh, well, the district court made a finding that there was probable cause to search for the felony suspect at the residence. Well, I would like you to address that finding, because I'm... In fact, to me, that's the most difficult part of this case. I don't really understand why that's the case. First of all, is that a legal or a factual question? If there is probable cause? Well, I think that the district court found that there was probable cause based on the factual findings, and I believe the factual findings would show that there was probable cause of the murder of a lot. Factual findings, I understand them, and you can correct me, were they were looking for some... It's parolee. Somebody said that he was seen riding his bike in front of this house, right? Yes, Your Honor. Or maybe seen leaving this house. There were different versions. Yes, Your Honor. And they came there and there was a bike. Basically, that's it. Yes, Your Honor. Well, first of all... To me, I mean, if you ride a bike in front of a house, you're not in the house. I mean, you go, you're moving, right? So you're necessarily leaving. You're literally riding around in circles, which most grown-ups don't do. So what does it mean to say he was seen riding a bike in front of the house? Why does that prove he was in the house? Well, I think a reasonable officer would be entitled to qualifying immunity if they were told that the actual suspect was riding a bike in front of the house and there was the bike in front of the house upon arrival. And you think that's probable cause of the guys in the house? And the bike was in the yard upon their arrival, and the officers... It wasn't the bike, it was a bike. Correct, correct. A bike is in front of a house and somebody was seen riding a bike past the house. So any time you see a bike that's in front of a house and somebody's riding the bike past the house, that means he's in the house. Well, I think... The person seen riding the bike past the house is in the house. Well, I think what we're talking about is... Probably in the house. ...a reasonable belief that probable cause existed. I know, and I don't understand it. Well, if one officer could have believed that probable cause existed, then qualified immunity should apply. If I have a bike in front of my house and somebody's riding a bike past my house, that person's in my house. Well, the defendants... Even probably, or even possibly. The defendants were part of the community-oriented police team who were assigned to assist the sergeant who was on the TOPS team that tracked the felony suspects at large. And as the team arrived, the sergeant dispersed our defendant officers, who is only... It's only their viewpoint that we're concerned with. He dispersed the defendant officers to the backyard for containment and to clear the area as the sergeant went to the front area. Now, before searching the shed, our defendant officers saw the sergeant in the house, and therefore they would believe... A reasonable officer in their position would believe that the sergeant gained lawful entry to the home, whether by consent or by exigent circumstances. Our officers saw through the back door that the other team of officers were inside of the house. So our officers, that are the defendants in this case, would reasonably believe that the sergeant's team, the three that went to the front door, either had consent, exigent circumstances, or a lawful means to enter the residence. And then they were tasked with clearing the backyard. So I would submit that, from their point of view, exigent circumstances existed to believe that they needed to clear the entire yard for officer safety reasons. Why were there exigent circumstances? Because this is a very unique situation where you have a shed within the backyard... Why were there exigent circumstances? Even if you thought this guy... If you thought he had probable cause to think he was in the house, what was exigent about? They didn't see him go into the house. He wasn't committing a crime at the time. Why was it any different than any other situation in which they think there's a felon in the house? Well, the exigent circumstances, I would submit, are based on officer safety reasons. But that's going to apply any time there's a felon in the house? No, because our officers had a reason to believe that this felony suspect was armed and dangerous. Any time there's somebody they think could be armed and dangerous in the house, they can go into the house. I'm talking about into the shed right now. Well, you first have to establish he could have even gone into the house. Well, that's why I think it's important I'd like to stress to the panel is that our officers went to the backyard, were assigned to go to the backyard. While they were searching the backyard, they looked and saw through the house that the other officers were in the home. So they would have believed that those other officers had a lawful means to enter the house, whether by exigent circumstances or consent. And so, therefore, there would be a reason for them to continue clearing the backyard and making sure that that area was safe as a protective... But if he were in the backyard, right? If he was in the house, they would have seen him come out, right? Well, if he was in the... But they don't know... They're sent to the backyard to clear the backyard so that they can establish containment. So they don't know where the suspect is as they're searching through the entire backyard with guns drawn, looking for an armed and dangerous felony suspect. And I would respectfully submit that that is warranted as a protective sweep. And furthermore, I would really like to stress to this court that the officers should also be entitled to qualified immunity because the district court applied the force-by-provocation doctrine in a novel manner in this case and not in the traditional manner that it normally applies. The officers' conduct did not provoke a violent response. Now, as stated in Billington v. Smith... But that's really odd because, in other words, they have... The plaintiff is now worse off because he wasn't violent than if he was violent. But I understand that, Your Honor. But from the viewpoint of the officers, to provoke a response is comparable to escalating the situation. Now, in this case, as Deputy Conley peered into the shed, there wasn't a reasonable belief that a gun was pointed right at him. So in this case, our officers did not have an opportunity to reassess the opening of the shed door and these tense and evolving circumstances because at the moment he peered in the shed, the gun was pointed at him. In Duran v. City of Maywood, the court stated that for the force-by-provocation theory to apply, there must be evidence to show that the officers' actions were excessive and that these actions caused an escalation. So the normal circumstances in which this force-by-provocation theory has been applied is where the officers' conduct is escalating a situation and making it necessary for the officers to use force in response to force used by the suspect or escalating situation. Now, in this case, that's not what happened. And I understand you don't agree with any of this. Your points are well taken or certainly sensible. But assuming that they had no right under the Fourth Amendment to open that door, right? That's what we're assuming at this point in the argument. Then they, in essence, they did provoke what happened in the sense that because somebody was coming in, this guy got up and had his gun in his hand. I would submit that the law is not clearly established that provoke could be used in that manner. Under the law and the existing case law, provoke as a legal term for the force-by-provocation doctrine means to escalate the situation and elicit a violent response back by the suspect which then requires the officers to take... The way you're trying to apply the reasonable officer or the precedent question, doesn't a reasonable officer have to think logically, i.e., if I couldn't do this, if he was actually trying to shoot me, I also can't do it if he's not actually... If I couldn't do this, if what I was doing made him react and attack me, then I can't do it for this reason either? Because the damages implied in this case, as I'm sure the court is aware, the force-by-provocation doctrine is heavily criticized by the other circuits because force should be measured by the time and the circumstances that the force is exerted. Now, the Ninth Circuit allows damages to piggyback on from the force if the predicate constitutional violation was intentionally and recklessly caused. However, the law is not clearly established and there's certainly no authority to broaden the force-by-provocation doctrine and apply it in circumstances where this was really an unfortunate incident. The district court found specifically that it was a very terrible coincidence that the moment Deputy Conley was peering in, the plaintiff was moving his BB gun rifle because he thought the homeowner was there to play a joke on him. So, the force-by-provocation doctrine is not meant to apply in those types of situations. The court said that the unlawful search, the unlawful entry, and the failure to comply with the knock-and-announce requirement were worth $2. But the court allowed all the force damages to be recovered under the force-by-provocation theory. And I understand what your court is saying is that his acts precipitated a response, but the law has not clearly established that the doctrine, which is heavily criticized. You're out of time. Okay, I'm sorry. Which is heavily criticized should be allowed to be used in this manner. Okay, thank you very much. Thank you. Good morning, Your Honors. Good morning. David Drexler on behalf of the plaintiffs and respondents and cross-appellants. Your Honors, I was going to start with the Billington analysis, and I believe that the court, the district court, properly held that all of the criteria for the Alexander Standard, as interpreted by Billington and the Duran case and Espinoza and Glenn  that the court properly applied that because the conduct of the officers were intentional, reckless, and created the circumstances, created the violent confrontation and the need to use force, excessive force, because there was the provocative predicate constitutional violation of a warrantless search and forced entry without knock-and-notice. Is this issue even subject to qualified immunity? It seems to me that this issue, the Billington issue, is really a causation question about what damages you can get. And it's not really a question of what the officer should have done. I mean, it's not, it doesn't deal with their behavior. It's not that they, that's the whole point of it. It isn't that there was anything wrong with their behavior at the time they shot him. The question is whether they should be responsible for the consequences of opening the door, which is not a qualified immunity question, is it? Humbly, my own interpretation is that what this court has been striving to do is put certain limits on qualified immunity because in circumstances where otherwise the shooting would be justified, and the district court found that here, that the circumstances leading up to it are so unreasonable, objectively unreasonable from a Fourth Amendment standpoint. And that's what the Billington analysis says. So I think it goes beyond causation. I think this is a way to say that even if officers are going about the actual shooting, the moment of shooting, even if that's okay under an analysis of the justification because they thought they were in danger at that moment, if everything leading up to it, and I want to go back to what Your Honor had said about probable cause in the first place, they never had probable cause to believe that this person ever resided there. This wanted parole. Never resided there. I mean, that's conceited as I understand it. The question is whether they had probable cause to think he was in there. There was none. They raided two places, the officers, and during the briefing, very, very specifically, Deputy Risling said that the Mendez lived there. Probable cause is an objective standard. I didn't really understand all your emphasis on this other house. I mean, it goes to their motives or their freight of mind, and you've spent a lot of time in that in your briefs, and all that might be true, but it doesn't really help on the legal case issues, does it? Well, I think when you focus on whether they never had probable cause in the beginning to believe that he was present at the house, that he lived at the house, and Your Honor pointed out a bicycle there, a different bicycle, and we at trial proved that was someone else's bicycle. They didn't know it was a different bicycle. They knew it was a bicycle. They didn't know it was the same bicycle. They just knew it was a bicycle. But from surveillance, Officer Deputy Risling knew that this individual, Rodarte, this person on the bike, went to both houses, and at that particular time, it was just as reasonable to believe that. They wanted to toss what they believed were two dope houses. That's what they wanted to do. They didn't have probable cause to believe. Which I think is useful to the legal arguments. Well, whether it is or not, Your Honor, if they had no probable cause, and this is raised in our cross appeal, if they had no probable cause to believe that the wanted parolee, who was not armed and dangerous, the evidence was he never had arms, or I think the most that everyone is. But if the deputies were told he was armed and dangerous, what are they supposed to do about it? They knew that he had evaded capture. These particular two people knew that? How do we know that? Well, in the evidence at trial, there was no direct correlation by any deputy that they knew that he had ever been armed, he had ever committed a crime using arms. I mean, at some point people have to be able to operate on what they're told. They had a piece of paper telling them that he was armed and dangerous. What are they supposed to do? Go around investigating whether he was or in fact armed and dangerous? Well, even assuming that the caricature of armed and dangerous, which is tagged on every parolee that is out there, even assuming that, if they have no evidence or probable cause that he's in that house, that he resides there, or that he's running through the house, and, Your Honor, the game is over at that point because they're told by the informant, allegedly, that he already left the house. It wasn't that he was riding the bicycle in front of the house or parked the bike. He had already left. So with that information. What is the record on that? I know that that was in one of the interrogations. Was it evidence in the trial? I thought that the evidence in the trial was kind of, you could think that he left the house and you could think he didn't leave the house. Oh, no. It was very, very clear because Sergeant Minster stated that recorded, and this was part of his statement, that the information that was received from the informant, allegedly through Deputy Risling when she called this informant, and again, that probably was this Charlie Green who was in the same place at the same time watching, was very clearly, quote, the parolee had left the Hughes house on a bicycle. He had already left. That is in evidence that was both shown in the actual Bureau of Investigation statements as well as Officer Sergeant Minster testified at trial. So very clearly, he was not, he had left. If there was a person on a bike, he had left. That person had left, was not a threat to anyone. There were no exigent circumstances. But Your Honor, going back to what you said about the causation, what it really comes down to is once the officers know that Mr. Odell, the wanted parolee, is not in the house, he's not running in the house, he's not running from the house, and the two deputies who went around the side gate and accessed the yard, and then they communicate with Sergeant Minster, at that point, they know there is no person running from the house. There's no person in the house. And what the U.S. District Court judge seized upon was at that moment that they're looking at the Mendez shack, knowing it's totally different than the other shacks. This is something, a house that has cords, electrical cords. It has all the indicia of habitation. And they were told that the Mendez's lived there. They knew because of certain... Well, Charlton Mendez lives somewhere in the back of the house. That was the only place that looked like it was habitable. If you see the photographs, clearly there's evidence of people living there. There's wardrobes. There's dressers outside. There's, this is not just debris strewn. It looked, the judge, the District Court judge looked at each photograph and said, it's clear people were living there. And they knew it. But so, at that point, where is the exigent circumstances? Where is the reason to give them any qualified immunity? If objectively, their officers are acting unreasonably, and they're charging towards this shack when there's no, and they were asked at trial, the judge interjected and said, well, did you believe that an armed and dangerous parolee was in that shack that you approached? No. Did you, this is. I thought they said they didn't think they were in danger, but I didn't think they said they didn't think he was in the shack. Absolutely. Chris Connelly testified that it's one of the benefits of having been the trial attorney and then argue the appeal. Yes. Connelly said he did not believe that the person was in the shed, that there was anybody that the person they were seeking, the wanted parolee, did not believe is in the shed or there was any threat. That's a different story. In present in that shack, the judge called it. So what was his explanation for why they went there? That's a good question. Acted unreasonably and going up to the, what was the explanation they offered in, in my recollection of the evidence, they didn't offer any good reason. They were just searching. They went back there to search an additional housing unit that they saw this dwelling and they, they shouldn't have, there was no good reason to do. We know there were no exigent circumstances and that's what the U.S. District Court properly seized on. When they were standing there, there's no reason they couldn't have gotten a warrant. There was no way to escape. If someone is living in a seven by seven shack that has absolutely no other escape, there's one door in the front and there, and there's a curtain in front of it. And, and these officers knew that they could have observed it. They could have knocked and noticed. They could have called for backup. There were dozens of officers in that area circling both from the other house rated as well as posted in the front of the house. The premise of the district court, although somewhat in passing and somewhat contradicted by other statements he made, was that there was probable cause to think that guy was in the house. He did say that at one point. And then he said that I don't need to focus on what happened in Hugh's house because we don't need to focus on the curtilage.  I mean in the, in the shack. He said there was probable cause to think it was in the shack. At one point he said that. Okay. My, again, my recollection of the record is that he believed that the court found that there was probable cause to believe that the wanted parolee may have been in the house, but not in the shack, especially given the officer's testimony that they didn't believe that he was there. So at that moment they go with, there is no valid consent to be there to begin with. There, it's a warrantless search. And as, as the judge said, the district court judge said, we have no exigent circumstances here why they can't get a warrant. All the line of cases that talk about warrantless search and all the cases that talk about qualified immunity, really all hinge on reasonable conduct. Is the office, are the officers acting reasonably here? The court found that it was unreasonable for them to believe that it was on council judge. Cool. Yes. I'd like to interject a question. Of course. Could you please address a balance argument that this case represents extension of the force by provocation doctrine? I don't believe it, it involves an extension. I believe it's consistent with Billington and Duran and Espinosa in your, your honor in Espinosa, the court found there was no warrant. There was no exigent circumstances. There was no consent to enter what they believe was a drug house or a drug apartment in that case. And, and the individual who was hiding in the attic, he said, okay, come and get me or kill or be killed. And they shot him in that case. They felt that this is the, your ninth circuit found that this is something that again, consistent with Billington, which is really a refinement of the Alexander standard, because that was the first case that found where officers negligently get themselves into dangerous condition, necessitating force. And that was under the guise of service of a health department warrant. So it's not an extension. It's really simply a refinement or a definition of this Alexander standard that we know it has to have excessive unreasonable conduct. And we judge it on a reasonable standard, intentional or reckless based on the fourth amendment, reasonable standard. So I think really your honors, what we're looking at is if the conduct is so unreasonable and then is intentional or reckless. And that in and of itself is a provocative predicate constitutional violation. It's not an extension of Billington. It's exactly what Billington and its progeny hold that if the officers create a situation and they did where there was a violent confrontation and a need to use excessive or lethal lethal force, then we've established the Billington elements. And that's clear in Espinoza. It's clear in the more recent Glenn case, which involved this 18-year-old who had a pocket knife on the driveway, said he was going to kill himself. And they shot him full of beanbags. And he takes a line of escape and they shoot him because he's in front of them. But it was the shooting of beanbags that escalated the situation. It was confrontation. This is no more an extension of Billington than Espinoza and Glenn. It gives the same criteria, the same unreasonable conduct, the same either intentional or recklessness leading up to a violent confrontation. There's no question that the officers in their recklessness caused a violent confrontation that led to very, very serious catastrophic injuries. Okay. Thank you, Counsel. If you would address Ms. Cantrell's argument that as it relates to the two officers in the backyard, they were dispatched to search the backyard and that they should reasonably be found to have assumed by having been dispatched there that there was either consent or exigent circumstances justifying the entry. Well, Your Honor, what cuts that off is that, number one, there was no consent to search the curtilage or side yard. Also, they checked in with Sergeant Minster and at that point, Sergeant Minster and the other officers knew that there was no person running from the house, there was no person in the house. So where it cuts off, where they may have believed at some point that they had access or they could have accessed the side yard, once they know that the wanted parolee is not there, he's not running, there's no exigent circumstances and they were told that these people, the Mendezes, are living in the shack. Everything from that point is game over. They don't get to go there. They don't get to go in without knock and notice. They don't get to do it without a warrant. All they had to do was surround the shed, the shack, the dwelling of the Mendezes and say, come out with your hands up if you're in there or say we're going to bring other officers here for support. They were abandoned vehicles, as counsel pointed out. They could have taken cover. They could have waited. There was no exigency. So even if your Honor is correct that at some point maybe their conduct, and I think the U.S. District Court judge struggled with this a bit, saying well maybe they had a right to be there, but at some point that right ends when there's no exigent circumstances and no reason not to get a warrant. And so I think that's why we have Billington and that's why we have, I guess my time is up, but I would be happy to address any questions. Thank you very much. Thank you. We'll give you one minute to move out. Thank you. I'd like to address a few points quickly. I understand that your Honor is questioning whether there was probable cause. Let me ask you, it seems to me the one thing I really would like you to address is why the qualified immunity question applies to the Billington matter. The qualified immunity has to do with whether an officer is supposed to have known how he was supposed to behave. That's not what the Billington doctrine is about. It's about what damages or what, if he did something wrong at one point, what he's going to be responsible for in the lawsuit. It's not supposed to be influencing his behavior. I understand what your Honor is saying, but what I would say is that under the qualified immunity doctrine, an officer needs to be on fair notice or fair probability that what he is doing, he could be civilly liable for in a court of law later. These officers at the time knew that they were... To say that if they knew that they'd be responsible for shooting him, they wouldn't have shot somebody who was pointing a rifle at him? No, your Honor. From their viewpoint at the time of this incident, their head and what they know their own actions to be are opening a door to a shack in a backyard. So whether they would have opened the door would have been influenced by the fact that if somebody were in there who pointed a gun at them, they might shoot him? Because at the time they opened the door, they're not thinking they're going to be shooting somebody. Exactly. That's exactly right. Therefore, it has nothing to do with their behavior. It does, your Honor. I would respectfully submit this differs significantly from all the other forced by provocation cases in which the officer's own conduct is escalating the situation. Here, all the officers know is that they're opening the door to a dilapidated shed. Is this a causation doctrine? I see that causation ties into it, but they're not on fair notice that they're going to be on the hook for shooting somebody for simply opening the door to the shed. They're not escalating the situation. In Glenn, which is decided after this case in any event, the officers were escalating the situation. In Durant, escalating the situation. All they know that they're doing in their own head is opening the door. You did want to say something. Why don't you say what you did want to say? I also wanted to say, it seems like your Honor is questioning whether it was probable cause, but the district court at ER 52 specifically found there was probable cause to believe. I know it did, but that's why I asked you at the beginning whether it was a fact or whether that's a factual question. But what I wanted to submit, your Honor, is that the district court judge felt that there was probable cause. I know he did. So even if there wasn't, a reasonable officer, like the district court judge, could have made this mistake. One officer could have mistakenly believed that probable cause, as evidenced by the fact that the district court judge found there was probable cause. And that wasn't even a disputed issue in the similar fact. But there was one who was willing to proceed on that basis. I feel that a reasonable officer, like the judge, could make that mistake. And, of course, the qualified immunity is viewed from the viewpoint of only these officers. And the district court found there was, that Deputy Conlick testified that he didn't necessarily feel threatened at the moment he opened the shed. Not that he didn't believe that the suspect was in the shed. And, you know, if you read the testimony, it's taken out of context. He was basically saying he doesn't know one way or the other whether he's in there. But the subjective viewpoint, of course, is not the basis for qualified immunity. It's objective. Thank you so much. Another well-argued case. The case of Mendez v. Conley will be submitted and we will take a break.
judges: Gould, Berzon, Steeh